The opinion of the Oourt was delivered by
Johnson, J.
The first ground of the motion for a nonsuit, although it embraces two distinct points, presents but one which requires consideration, and that is, whether the recital in the lease is sufficient evidence of title in the plaintiffs, between the parties to this action. For admitting, that a possession is necessary to maintain this action, yet, a possession before entry, made by the defendant, and from immediately after it, up to the present day, no one will doubt, was such a possession as would support this action; although it was not immediately of the part trespassed on by the defendant, if the lease is sufficient evidence of title, on the principle of the case of Read v. Eifert,[1] decided,in this Court, possession of any part within the boundaries set out in it, is a possession of the whole.
In relation to the principal question, the general rule is, that a tenant is not at liberty to controvert3 the title under which he enters ; because, if it were otherwise, no person would be safe in parting with the possession, as he might be driven to the necessity of making out a complete chain of title before he could evict his tenant; and the law will not permit such a wrong, as to suffer a party to avail himself of a possession, thus acquired, to defeat the title of the party with whose permission he went into possession. The application of this principle to the present case appears obvious. The lease to the defendant is predicated upon the title in the plaintiffs; and it would involve a strange absurdity, if its having been made by a person pretending to have authority, should give it greater effect than if it had been made by those really entitled; and it would have this effect, if the position contended for was supported. The case of Jackson, ex dem. *Darby v. De Walts, (7 Johnson’s Reports, 157,) is in point.
The second ground of the motion for a nonsuit, involves, perhaps, a *224 question of more difficulty, as there is some diversity in the authorities quoted ; however, whatever might have been the ancient opinions on the question, the latter, and I think, the more correct, is, that that a lease made of the lands of the ward, by a natural guardian, is void. In the case of Parry v. Hodgson, (2 Wilson’s Reports, 129,[1]) the question was, whether a lease, made by a testamentary guardian, was void, or only voidable. The Court doubted, but they all agreed, that a testamentary guardian, until the infant was twenty-one years of age, and a guardian iu soccage until the infant was fourteen[2], were the same. But on an ulterius concilmm, they were clearly of opinion that a guardian of an infant cannot make a lease of his lands; and if he do, it is absolutely void. Ibid. 135. The Commentator on Lord Coke, also remarks, that the guardianship by nature extends no farther than the custody of his person, and determines on his arriving at fourteen years of age. 3 Coke'Lit. 88, b. Day’s Ed. It has also been decided in Massachusetts, that a natural guardian cannot make a lease of the lands of his ward. May v. Calder, (2 Mass. T. Rep. 55.) This decision, although directly predicated on a statute of that State, distinctly recognizes the principle of the common law as above laid down. If, however, the question could be considered as doubtful, I should be disposed to support this view of it, on the score of policy. It would be a monstrous injustice to permit an improvident father to deprive his infant of the means of support and education during the whole period of his minority; and this he might do, if he were permitted to make a lease for the whole period of infancy, and receive the rents in advance.
Gist, for the motion. Thompson, contra.
The ground made for a new trial[3] has not been much urged in the argument; and it is sufficient to *observe, in relation to it, that it is a principle too well established by authority now to be doubted, that the party cannot at law set up an equitable title in opposition to one which is legal.
I am of opinion that the motions ought to be discharged.
Oolcock, Nott and Cheves, JJ., concurred.
Gantt, J., dissented.

 Inf. 374.

See 1 Rich. 359.

 5 Strob. 8.

 Cited 6 Rich. 352; 7 Rich. 187; 8 Rich. 332.

 A. Eifert ads. Jacob Read.[2]
This was an action of trespass to try titles to land. The plaintiff deduced his title from an ancient grantee, and proved the trespass of defendant within his lines.
The defendant, in his defence, offered in evidence a junior grant, and proved an actual occupancy of eight acres for the space of fourteen years, under this junior grant, and within the limits of the older grant, under which the plaintiff claimed. The defendant set up a claim to all the land that his junior grant covered, upon the ground, that possession of a part was possession of the whole within the limits of his grant; and where he had been in quiet and peaceable possession for five years, the statute of limitations gave him a good and legal title against any older grant whatsoever.
*226 Mr. Justice Smith delivered his opinion as follows :
This case has been twice argued ; first in the autumn of 1815, when the court took time to consider; and again in December, 1816, before the seven judges; when it was fully understood, that notwithstanding there were other points in this case, yet, on this occasion, the grand question of the statute of limitations, in its construction of the doctrine of possession, formed the leading point. To this point alone I shall confine my opinion.
0011si^61’l:llS this question, it may not be improper to take a view of its history, at least as far back as we are able to trace it.
What construction the judges had given to this statute[1] previous to the year 1793, I have no means in my power to determine; but in the autumn of that year, Chief Justice Rutledge, in the case of Stevenson ads. -,[2] tried before him at Pinckneyville, charged the jury, that the possession of any part of what the defendant had titles to, gave him the whole within his lines.
About the year 1796, in the case of Shields against Hamilton,[3] tried before Mr. Justice Bat, the defendant, Hamilton, proved no possession or acts of ownership, but the cutting of two board trees; and the judge charged the jury, that this evidence was sufficient to establish his possession to the whole tract; and the jury found for the defendant accordingly, and the verdict was acquiesced in by the opposite party.
In the year following, in the case of Sutton against Hood,[4] tried before Mr. Justice Bukke, the plaintiff offered no other title than parol proof of a purchase by himself from one Ross, who had lived adj oining the land in dispute, and whose servant had cleared and cultivated abbut one quarter of an acre of this disputed land; and he, the plaintiff, when he purchased from Ross his good will, as it was called, for he had no title, took a receipt from Ross for the purchase money paid, but was not able to produce that receipt, or to account for its loss; yet the judge charged the jury, that this was a valid title, when the plaintiff' had paid his money for it, and had had the possession of this quarter of an acre of cleared land under that purchase. And the jury found for the plaintiff the whole tract, consisting of about two hundred and fifty acres. From this verdict there was an appeal to the full bench of judges at Columbia. Upon hearing the case reported and argued, that court were divided in their opinions. Justices Waties and Bat were of opinion, that the verdict ought to be set aside, on the ground, that the receipt given by Ross to Sutton, (MS.) and which constituted Sutton’s whole title, ought to have been produced on the trial, or accounted for. Judge Bukke, who had been of a contrary opinion on the trial below, now doubted; but he thought it safest to grant a new trial. Judge Gkimke was opposed to granting a new trial, on the ground, that Sutton had purchased, and had been put into possession under that purchase, which gave him a title in equity.
But the whole court agreed, that, had Sutton produced this receipt, or accounted for its loss, with his quiet and peaceable possession for five years, Ms title would have been complete. This cause went back, and was tried a second time before Mr. Justice Grimke, when Sutton accounted for the loss of the receipt, and under the charge of the Judge, that he had made out a good and legal title under the statute of limitations, they found for Sutton, the plaintiff, a second verdict; and upon the opinion which the Constitutional Court had given, this second verdict remained undisturbed, and Sutton has held the land ever since.[5]
In the year 1803, the case of Strange v. Durham,[6] was tried before Mr. Justice Tbezevaht, at Winsborough. The tract of land consisted of between *two and three hundred acres. Strange deduced a good title from the grantee down to himself. Durham rested his claim on Ms statutory right, and proved that he had been in possession of fifteen acres of this tract for more than five years. And to defeat this statutory right, the plaintiff, Strange, proved, that at the time *227 Durham purchased, he was informed of the better title of Strange, and Durham replied he did not care, for Strange would never come back to it. On this evidence, Judge Tbezevant charged the jury to find for plaintiff, on the ground of fraud in the defendant, who knew of plaintiff’s better title when he came into possession, which ought to defeat his possessory right. But the jury thought otherwise, and found for defendant. From this verdict there was an appeal to the Constitutional Court, which, at that time, was composed of six judges ; Justices Grimke, Waties, Bat, Johnson (since removed to the Federal Bench), and Brevard, who unanimously refused a new trial.[1]
There were many other cases that occurred on the circuit, which were tried and decided on the same principle.
In the case of Barbary Kinzey ads. Swann,[2] (Circuit,) tried before Mr. Justice Burke, at Pinckneyville, the judge admitted the defendant to join the possessions of two or three different persons, who had succeeded each other, with her own, neither of whom had held for five years alone, in order to make out five years in the whole. And under the judge’s charge the jury found a verdict for defendant.
This continued to be the undeviating opinion of the judges; and it was considered to be the law of the land.
Many valuable tracts of land were bought and sold under the universal belief, that possession of a part within the lines claimed by the party, gave him, after five years quiet possession, a legal right under the statute, to the whole.
This construction was practiced on until about the year of 1805, when the case of Jones and Smith,[3] (MS.) and shortly afterwards the case of Gourdin v. Theus,[4] which were argued and decided in Charleston, shook the old doctrine, and produced a difference of opinion among the judges. Justices Trezevant and Brevard were of opinion, that a possession of a part gave the possession of the whole. The other justices held, that the possession ought to entitle the possessor to what he had in actual cultivation, and a reasonable portion of wood land to supply timber for fences, building and firewood; but they laid down no rule by which there should be uniformity and certainty in the verdict. It was to be governed by the opinions of juries as the cases might occur.
In the upper and middle country, where land cases were frequent, and the law applicable to them very well understood, every lawyer was struck with astonishment at this decision. But they were told from the bench, that a majority of the judges had concurred in this construction of the statute, and it must now be conformed to in all future cases.[5]
However, a very few cases in practice showed as well the uncertainty *as the utter impracticability of ever carrying it into effect as a rule of law. No two juries could be had, who could think alike on the same legal question.
One jury would give the party the lands which -he had cultivated for five years, and the seme quantity of wood land to supply it with timber. Another jury, where there was no reason to differ in the case, would give twofold of wood land. And a third jury, with perhaps as little reason to differ, would give three, and sometimes founold.
Thus the measures of justice was as fluctuating as the caprice or different opinions of juries on the subject of convenience could make it. The rule had no uniformity, permanence or universality.
This was not the only defect. Another still more insurmountable difficulty *228 occurred under this rule. It was this: when the jury found one, two, three, or fourfold of woodland, neither they nor anybody else conocí ned in the case, knew where to locate it. They had no such power. They could not say, it shall be placed on the north or south, east or west, of the cultivated land. Nor had the judge who presided over the case any such power. And the surveyors would be entirely premature if they should attempt to fix the boundaries before the trial, because they could never tell whom the jury would find their verdict for, nor could they possibly divine how much wood land, or on what side the jury would find it. And the jury, who never had any possible data by which they could fix metes and bounds to this wood land, always left the question as vague and undeterminate as it was before they took it into consideration ; because, finding the quantity fixed no rights, it was finding the motes and bounds that located the rights of the parties.
Yet such was the doctrine urged in the case of Smith and Jones and Gourdin v. Theus, in Charleston; and such, for awhile, was the opinion of a majority of the judges. However, Justices Giumke and Winns, shortly after abandoned this opinion, and confined the occupant to the fences;[1] and then, there were not more than two judges of one opinion on the construction of this statute; and it has remained in this state of uncertainty ever since the autumn of 1809.
If the whole of the judges had concurred in this opinion, or even a majority of them, and had continued uniform in that opinion, I should, notwithstanding it had changed the principle, have considered it as the law of the land, and would have been among the last to interrupt it.
But when they, who had adopted this new construction had again doubted, or at least some of them, and gave to the statute a more limited construction, insomuch as to make it a new opinion, and leave no majority of any one opinion, it must now be considered as undecided on, and subject to such construction as the judges may think its legal import will bear.
*Th® first clause of the statute appears to me to contain all that is necessary to illustrate the subject.
It is in these words : “ Whereas, nothing can conduce more to the peace and tranquillity of this province, than the quieting the estates of the inhabitants thereof, for the effecting whereof, and the avoiding of suits in law: Be it enacted, That all possessions of, or titles to any lands, tenements, or hereditaments whatsoever within this province,” &c. Here the statute goes on to enumerate every kind of title known to our law, either by descent, gift, grant, or any other sort of written conveyance whatsoever, without the most remote allusion to a chain of title deduced from an original grantee ; and must evidently mean what, in its original state, was a defective title, as a good title could never stand in need of any such aid by statute.
In construing law, words are generally to be understood in their usual and most known significations ; not so much regarding the propriety of grammar, as their general and popular use. See 1 Black. Com. 59.
Then what would be the popular signification of the words, “quieting the estates of the inhabitants, ” &c., used in this clause of the statute ? I should think that every man would say it signifies not only that part of a man’s real estate, which he hath under his fences, but which he claims to have a formal title to, whether that title could stand the test of legal investigation or not.
The legal signification is the same. The law, in speaking of an estate, never contemplates to exempt from this signification, every claim to real property that may possibly be defeated by another better claim. If it did, then no man could have an estate, whilst a possibility of abetter claim for the same existed elsewhere. *229 And the law, in speaking of an estate, constantly alludes to a man’s entire claim, and not to what he may happen to have fenced and cultivated.
These other words in the statute, “ all possessions of or titles to any lands, &c.,” are technical words, and words of strong import. The legal definition of possession is what by the common law is denominated livery of seism, and means no more than the delivery of corporal possession of the land by the donor to the donee. This was formerly held to bo absolutely necessary to complete a good title. And at one time, was the only mode of transferring lands from one man to another. But it certainly must have intended to transfer all that the parties intended should pass, and not merely the land cultivated or fenced.
This corporal possession was given, not by putting the purchaser or donee in actual possession of every part and parcel of the land, but it was done by delivery of a clod or turf, or a twig or bough growing on the land, by the vendor to the vendee, with words to this effect: “I deliver these to you in the name of seisen, of all the lands and tenements contained in this deed. ’ ’ See Black. Com. 311-313.
This is the legal definition of possession; and explicitly expresses that a possession of a part is the possession of the whole.
This possession is that act of notoriety which Judge Blackstone says, in all well regulated governments has been ever held requisite, in order to acquire and ascertain the property of lands.
By the same learned judge, we are informed that by the Roman law, the entry was made into the premises or into a part of them, in the name of the whole.
‘ Among the ancient Goths and Swedes, contracts for the sale of lands were made in the presence of witnesses, who extended the cloak of the buyer, while the seller cast a clod of the land into it in order to give possession.”
Thus we see, that in the ignorant ages of antiquity, possession gave title, and extended to tho whole claimed by the party; and that entry into part was an entry into the whole tract.
And by the common law of England, even to this day, the delivery of a clod or turf, a rod or twig, of the whole tract conveyed, gives the possession of it.
Should possession now be passed by the delivery of a turf or twig in the name of the whole, and the possessor should remain, under-that delivery, in his hut or tent for five years, could our jurists say that he should be confined to his possessions upon this limited scale ; that is, to his turf or twig, when at the time of the delivery it was intended for, and really gave the possession of the whole lands conveyed ? Or can we suppose in this refined age (when agriculture has become the basis of national wealth, and what raises the comfort of man in civilized life, above that of the aboriginees of America or the wandering Arab), that we ought to be looking for reasons to lessen down real estates to an inconvenient, unprofitable and diminutive extent, scarcely worth possessing and never worth improving, instead of enlarging and amplifying them in proportion to their increasing value and the increasing estimation of private property ? Much more might be said on this part of the statute, but I shall leave it and make a few remarks on the words “titles to any lands,” &e., in the first clause of the statute, and as connected with the word possessions.
The word titles is a technical word also, as well as the word possessions, with which it is connected. And the popular as well as legal definition of it, is the evidence of the right by which a party claims to be the owner of real or personal estate; and the word possessions must mean such occupancy as the whole thing is capable of under that title. That is, if a person has a deed of conveyance for one hundred acres of land, this title deed is the evidence of his right; and if he is in actual possession of ten acres within the boundaries described in that conveyance, he is legally in possession of the whole, because that is the only possession of which the thing is susceptible. It obviously implies nothing else.
It was said in the argument in this case, that when this statute was enacted, there might have been reasons for giving it a different construction to what it would bear now. But I am not aware of any powers vested in the judges to change the construction of a statute law, because they might believe the reasons which induced the legislature to enact the law have changed.
This might be a ground for the legislature to change the law itself; but judges can not, nor ought they to, give, any but one construction to a statute; and that *230 ought to be the construction which it would obviously bear at the time of enacting it.
I think myself, that stronger reasons exist now for giving this construction to it, that possession of a part is the possession of the whole, than could have existed at the time the statute was enacted.
During the revolutionary war, many grants, with all the intermediate deeds of conveyance, were lost or destroyed, by which subsequent fair purchasers would *ose ^0*1' lands if possession cannot avail them. Also men were very *ignorant in the business of conveyancing until very lately. Thirty-five years ago, very few, if any lawyers resided out of Charleston. And for the want of legal advice, very often, the seller gave his own deed of conveyance to the buyer, and retained the grant and all other intermediate deeds; and perhaps after removing to the western country, considered them as waste paper and threw them away. But still, thousands of sales have been made, where no chain of title could be deduced, owing to these circumstances, yet the purchasers have considered themselves perfectly safe in their possessions under the statute of limitations.
Give the statute the limited construction of confining the occupant to his fences, the fair purchases and honest earned rights of many poor and ignorant citizens will be endangered, and a new source of law suits will be opened, which the statute intend to pnevent. It is the poor and the ignorant who will suffer most under this narrow construction. The rich and informed have the means of knowing, and in due time protecting their rights.
I am therefore of opinien, that on a fair construction of the statute, possession of a part, under any of the titles enumerated in it, is a legal possession of the whole comprehended within that title.
But where the occupant has no title, in writing, to himself, or those under whom he claims, I think he ought to be confined to his actual occupancy, because he has no evidence that his claim extends further.
Upon these grounds, I am for a new trial.
Justices Gkijike, Nott, Gantt and Johnson, concurred.
Justices Coloock and Bay, dissented.
Bacon and Martin, for the motion. Stark, solicitor, contra.
N. B. — The judges at this time all delivered opinions, but for the sake of brevity, we have deemed it sufficient to select the able opinion of Mr. Justice Smith, as expressive of the opiinion of the majority of the Court. R.
See Williams v. McGee, 1 McR. 85; 6 Rich. 66; 4 Rich. 623.

 7 Rich. 355 ; 6 Rich. 352; 5 Rich. 524.

 Decided at Columbia, May, 1817. See 1 McR. 96.

 2 Stat. 583.

 Circuit.

 Circuit.

 Circuit.

 I commenced this action, and was the only counsel concerned for Sutton, and I am not mistaken in a single circumstance. It is also well known to other gentlemen of the bar. [Note by Judge Smith.]

 2 Bay. 429 ; 1 Brev. 83.

 I was the only counsel for Durham, the defendant, in this case, and I state it from a perfect recollection and also from ample notes. [Note by Smith, J. ]

 Contra Rice, 10 ; 2 Brev. 151.

 2 Rice’s Dig. 322; a full note of it contained in^ Judge Wilde’s opinion, 3 Brev. 157.

 3 Brev. 153. Another but earlier trial of this case, involving other points, is reported in 1 Brev. 326, and favorably noticed 4 Rich. 527; a second appearance of the case is in 2 Brev. 35, on a question of costs.

 Mr. Justice Waties laid down this new rule in the case of Doctor Moore ads. McClure, tried at York in the autumn of 1807, and Moore lost the cause on that ground. [Note by Smith, J.]

 Mr. Justice Wilds held this opinion in a case tried before him in Columbia, about the Spring Term of 1807. Mr. Justice Gmmke held this opinion, for the first time, in the case of Gabriel Manigault v. William Saucer, decided in the Constitutional Court, at Columbia, in May Term, 1810. In that case he remarked the great uncertainty of fixing limits or boundaries to this wood land, and he would in future confine the party, who claimed by possession, to his fences. [Note by Judge Smith.]

 8 Rich.. 332.